James E. Barton II (#023888)
Jacqueline Mendez Soto (#022597)
BARTON MENDEZ SOTO PLLC
401 West Baseline Road, Suite 205
Tempe, Arizona 85283
(480) 550-5165
James@bartonmendezsoto.com
Jacqueline@bartonmendezsoto.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Diane Onofrio;<br><br>    Plaintiff,<br><br> v.<br><br>Mingus Mountain Academy and Sequel Youth Services of Arizona, LLC;<br><br>    Defendants. | Case No.:<br><br>**COMPLAINT** |

This Complaint arises out of an employment relationship between Plaintiff, Diane Onofrio, and her former employers, Mingus Mountain Academy ("Mingus" or the "Academy") and Sequel Youth Services of Arizona, LLC ("Sequel" or "Corporate") (collectively "Defendants"). For her Complaint, Plaintiff states as follows:

**THE PARTIES**

1. Plaintiff was a resident of Yavapai County, Arizona, and an employee of the Mingus and Seroquel during all relevant time periods.

2. Mingus Mountain Academy is a private business headquartered and operated

in Yavapai County, Arizona.

3. Mingus continuously employed over 15 employees in the relevant twenty calendar week period.

4. Sequel Youth Services of Arizona, LLC is an Arizona Limited Liability Corporation with its principal place of business as Maricopa County, Arizona.

5. Sequel continuously employed over 15 employees in the relevant twenty calendar week period.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) for matters arising under the Constitution and laws of the United States; 28 U.S.C. § 1367 as supplemental jurisdiction over state claims that are related to the federal claims that they form part of the same case or controversy; and for employment discrimination matters under the American with Disability Act, 42 U.S.C. § 12101, et seq., and injunctive relief therein.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

**ALLEGATIONS**

**Background**

8. Plaintiff began working as the Director of Quality Assurance at Mingus in August 2018.

9. Plaintiff's duties and responsibilities related to reviewing the work of other Mingus employees and confirming that their work complied with state and federal regulations, industry standards, and corporate guidelines.

2

10. As Director of Quality Assurance, Plaintiff reviewed the work of her direct reports, provided a vision for the department, and directed its operations. The position did not require real-time monitoring of the activities of her direct reports, who indeed also worked remotely into the summer of 2020.

11. As Director of Quality Assurance, Plaintiff never directly supervised Mingus' residents.

12. Plaintiff underwent brain surgery in December 2019, and as a result took medical leave from Mingus until February 17, 2020.

13. Plaintiff suffers from asthma, Sjogren's syndrome, high blood pressure and underwent brain surgery in December 2019 for a brain aneurysm.

14. The conditions described in the above paragraph, including the identified autoimmune disease, make the Plaintiff particularly vulnerable to viral infection.

15. Plaintiff began working remotely for Defendants in March 2020 upon the emergence of the novel coronavirus (COVID-19) and its spreading throughout the United States and Arizona.

16. Plaintiff was pleased to begin working remotely and be freed from the risk of exposure to COVID-19.

17. Nonetheless, the new work accommodation was directed by Mingus Executive Director Jessica Hines.

18. Ms. Hines ordered Ms. Onofrio to begin working from home, noting that if anyone who worked at Mingus would be likely to contract COVID-19, it would be Ms. Onofrio.

19. Ms. Hines was prescient in her evaluation of the risk posed by Mingus; in April 2020, the Academy saw 125 cases of students and faculty members contracting the virus.

20. In May 2020, Ms. Hines began suggesting that Plaintiff would need to return to in-person work.

21. This suggestion concerned Plaintiff as she was aware that on April 25, 2020 Defendants had their first case of COVID-19 at Mingus. As stated above, this number would swell to 125, thus by the end of May, Mingus did not have the outbreak under control.

22. Defendants directed Plaintiff to return to in-person work.

23. Upon information and believe, Defendants' demand was not based on any subsiding of the risk of COVID-19 nor any change in precautions taken to avoid exposing employees to COVID-19.

24. In May, Plaintiff took sick leave to visit her doctor and discuss her medical conditions and the conditions at the Academy.

25. After discussing the Academy's demand that she return to in-person work with her physician, it was determined that given her compromised immune system, this would not be safe for her—particularly in light of the recent COVID-19 outbreak at the facility. Ms. Onofrio's physician provided her with a note directing that she not return to work in person for thirty days.

26. Plaintiff requested an accommodation to continue working from home and provided Defendants a June 9, 2020 doctor's note stating that as a result of her high-risk

4

status she must work from home for at least four weeks.

27. Upon information and believe, Mingus management was angered by receiving the note. Prior to leaving on her vacation, Ms. Hines simply expressed that a month was a long time to be working from home.

28. As the four-week period neared a close, Plaintiff received a call from Mingus Vice President Michael McFarland who threatened her with termination if she got another doctor's note excusing her from working in-person.

29. Mr. McFarland took a hostile and aggressive tone during the call and insisted that he needed a Quality Assurance Director on campus, but it did not have to be Ms. Onofrio.

30. Three times, Plaintiff asked if that meant she would be fired if she got another doctor's note. And Mr. McFarland responded, "Yes, Diane, that is exactly what I am saying."

31. Plaintiff recognized this threat to be retaliation for her attempts to exercise her rights under the ADA and Arizona Earned Paid Sick Time law, and contacted Roy Day, the Vice President of HR about this behavior by Mr. McFarland.

32. Plaintiff also spoke to Mr. Day about formalizing her request for an accommodation under the ADA, and emailed the request to him—in the manner he had described for her to do.

33. She also spoke to her interim direct supervisor Sylvia Steger, Director of Compliance.

34. Sylvia Steger was filling in for Abby Manter, Division Quality Manager who

5

was on PTO.

35. Plaintiff spoke to Susann Young, Vice President of Administrative Service at Sequel.

36. Ms. Young assured Plaintiff that the Mingus V.P. did not have the power to fire her for providing a doctor's note excusing her from working in-person.

37. When Ms. Manter returned from PTO, Plaintiff pressed her for an answer on what she should do in light of Mr. McFarland's tirade. She directed her to continue working from home.

38. Plaintiff provided Defendants with another note that required that she not return to in-person work until August 9, 2020.

39. In July, Plaintiff was informed by the management team at Mingus that her accommodation had run out—an inexplicable notion contrary to the ADA—and that she must return to work in-person.

40. Thus, in response to demands from Mingus, Plaintiff considered a proposal for her to begin in-person work.

41. After Plaintiff's request for an accommodation, and in light of the demands for return to in-person work, Plaintiff participated in a conversation with the employer to protect her from exposure to the deadly virus while allowing the employer to have her work in the office for some undisclosed benefit to the employer.

42. Mr. Day set a phone conference with Ms. Hines, Ms. Manter, and Senior Director of Compliance and Quality Marianne Birmingham. Mr. McFarland was invited but did not attend.

43. The parties clearly expressed their expectations on this call. Mr. Day, speaking on behalf of corporate HR, made it crystal clear that Defendants would take responsibility for providing an alternate accommodation to Ms. Onofrio that would allow her to safely return to work.

44. Also, on this call, Ms. Hines reiterated that there was no concern that Ms. Onofrio's performance was lacking in any way. Thus, in the words of the employer, it was difficult to understand why the accommodation that was already in place—working remotely—was not a reasonable accommodation. Nontheless, Ms. Onofrio worked with the employer to develop the new accommodations that would allow her to return to in-person work.

45. The parties agree that Mingus would:
   a. be responsible for a deep cleaning of Plaintiff's office prior to her return.
   b. conduct a daily sanitizing of Plaintiff's office.
   c. provide Plaintiff with two N95 masks and additional sanitizing products for her office.
   d. inform Plaintiff of any positive COVID-19 tests for employees or clients.
   e. require all employees to wear masks when meeting with Plaintiff.
   f. post signs on Plaintiff's door forbidding other employees from entering and using her office.
   g. meet weekly with Plaintiff for status updates.

46. Under these conditions, Plaintiff returned to in-person work on July 30, 2020.

47. The employer failed to take any of the accommodations that were the product

7

of the iterative process.

48. When Plaintiff asked for receipts from the cleaning service, Ms. Hines claimed she had personally cleaned Plaintiff's office. Although Ms. Hines reported to have personally clean Plaintiff's office, it was not cleaned, let alone sanitized. There was dust on the shelves. There was no evidence of using fog to sanitize the space.

49. Corporate HR workers who had just traveled to the Mingus facilities on commercial aircraft and were staying in hotels used Plaintiff's office until midnight the day before her return.

50. Plaintiff's chairs were not in her office upon her return, but were in other offices, and thus were not cleaned as required.

51. A Sequel employee from Michigan, who also had recently traveled to the area via commercial air, was directed to use Plaintiff's office after she left, the first day of her return. This individual texted Plaintiff and told her that he could not leave her office.

52. The office was not cleaned after this individual used it.

53. The following day, July 31, 2020, Plaintiff addressed her concerns to her direct supervisor, Abby Manter, who assured Plaintiff the matter would be addressed.

54. It was not.

55. For some period of time, Plaintiff began working part-time to minimize her exposure to COVID-19 at Defendants' facility.

**State Investigations**

56. Plaintiff's concerns were not only based on the disregard of the agreed upon accommodations—failure to clean and sanitize her office and to keep others out from the

office—but also the on-going state investigation into the facility.

57. The State of Arizona investigated Sequel for several reasons unrelated to COVID-19, but failure to respond to COVID-19 concerns was among the reasons that Mingus was no longer taking new clients shortly before the events described above.

58. In addition to other serious health and safety violations, the Arizona Department of Health Services expressed the following concerns and made the following observations related directly to COVID-19:

   a. No evidence of programming. Staff & Kids report this has been an issue since COVID-19 outbreak;
   b. Lack of evidence of adherence to COVID-19 screening and distancing procedures;
   c. Cleaning and Disinfection protocols need to be followed and documented. No clear staff responsibility for cleaning/disinfection specific areas of campus;
   d. Youth are not wearing facial coverings and not observing social distancing.

59. The state of chaos at Mingus also increased the danger for Ms. Onofrio to return to work in-person.

60. For example, clients running away from the facility and being returned to residential status increased the likelihood that they brought the virus into the facility.

61. Numerous trips to the ER that Mingus residents experienced also increased the likelihood of the virus coming on campus.

62. And of course, the shocking 125 cases of COVID-19 within the facility

demonstrate how real the threat was.

63. The week prior to the phone call with HR establishing the second accommodation plan for Ms. Onofrio, Ms. Birmingham and Samantha Lee from Sequel came to Mingus to assist in developing a corrective action plan that would include wearing masks and other COVID-19 protocols.

64. On August 3, 2020, for the sake of her physical safety, Plaintiff notified the employer that exposing her to a deadly virus, particularly in light of her compromised immune system, was an intolerable work condition and that the employer had until August 18, 2020 to address her concerns.

65. On August 12, 2020, Defendants terminated Plaintiff in retaliation for her request that they accommodate her disability.

66. Defendants paid Plaintiff through August 18, 2020.

67. On October 14, 2020, Plaintiff filed a charge with the EEOC.

68. On May 15, 2021, in response to the Plaintiff's request, the EEOC issued a notice of her right to sue.

## CLAIMS

### Count 1
### ADA Discrimination
### (42 U.S.C. § 12112(a))

69. Plaintiff incorporates the allegations set forth above as though fully set forth herein.

70. Plaintiff is disabled, qualified to perform the work of the position she held with a reasonable accommodation suggested by the employer, and was terminated because

of her disability. 42 U.S.C. § 12112(a).

71. As described above, Plaintiff suffers from asthma, high blood pressure, an autoimmune disease and during relevant periods was recovering from brain surgery: she is disabled within the meaning of the ADA.

72. Plaintiff was qualified to perform and did performed her duties as a Director of Quality Assurance at Mingus without incident from August 2018 until she was terminated in August 2020.

73. Plaintiff's accommodation, initially required by her employer and later as she requested to continue, was reasonable as evidenced by the fact that she performed her duties as from home from March 2020 until she was terminated in August 2020.

74. Plaintiff's being directed to return to work in spite of the risk it posed to her health was an adverse employment action.

75. Plaintiff's being terminated was an adverse employment action.

76. Both of these actions were taken against Plaintiff because of her disability, as evidenced in part by Vice President McFarland's threatening her if she provided a note from her doctor.

77. Plaintiff suffered a loss of pay due to her unemployment following her unlawful termination.

78. Plaintiff suffered emotional distress as a result of her unlawful termination.

79. Defendants recognized that a Vice President could not fire someone for exercising a federally protected right to be free from discrimination due to disability, and indeed, one representative of Sequel assured Plaintiff of this.

80. Defendants nonetheless allowed another representative of Defendants to brow beat Plaintiff for her asserting her rights under the ADA.

81. Defendants put Plaintiff's life in danger when reneging on promised accommodations and luring her back to in-person work in a contaminated space.

82. Based on Defendants' malice and reckless indifference toward Plaintiff's federally protected rights they are liable for punitive damages. 42 U.S.C. § 1981a(b).

## Count 2
### ADA Retaliation
### (42 U.S.C. § 12203(a))

83. Plaintiff incorporates the allegations set forth above as though fully set forth herein.

84. Plaintiff engaged in activity protected by the ADA, suffered adverse employment action, and suffered that action because she engaged in the protected activity. 42 U.S.C. § 12203(a).

85. Prior to July 30, 2020, Plaintiff was performing her work in accordance with an accommodation that she had negotiated with her employer.

86. After May 2020, Vice President McFarland contacted Plaintiff and harassed her for asserting her right to a reasonable accommodation under the ADA.

87. Vice President McFarland's verbal assault and demand that Plaintiff conceal her medical condition from her employer—threatening her with termination if she presented another note from her doctor—was unmistakably inspired by her assertion of rights under the ADA.

88. Defendant terminated Plaintiff in retaliation for her exercising her right to

receive a reasonable accommodation under the ADA.

89. Plaintiff suffered loss of pay and emotional distress as a result of this retaliation for which the Defendants' are liable.

90. Defendants are further liable for punitive damages due to the malice and reckless indifference for Plaintiff's federally protected right to be free from retaliation.

**Count 3**
**ADA Interference**
**(42 U.S.C. § 12203(b))**

91. Plaintiff incorporates the allegations set forth above as though fully set forth herein.

92. Plaintiff engaged in her statutory protected right to request a reasonable accommodation.

93. Plaintiff performed her duties under a reasonable accommodation, initially required by her employer and later as she requested to continue.

94. Defendants threatened Plaintiff with termination if she sought to extend the duration of her accommodation.

95. Defendants coerced Plaintiff to relinquish her accommodation—remote work from home—to which she was entitled, under the false representation that they would provide her with an alternative accommodation upon her return to in-person work.

96. Defendants engaged in these unlawful actions with the intent to discriminate against Plaintiff.

97. Plaintiff suffered loss of pay and emotional distress as a result of this interference for which the Defendants' are liable.

98. Defendants are further liable for punitive damages due to the malice and reckless indifference for Plaintiff's federally protected right to be free from retaliation.

### Count 4
### Intentional Infliction of Emotional Distress

99. Plaintiff incorporates the allegations set forth above as though fully set forth herein.

100. Defendants' commanding Plaintiff to risk her life by returning to contaminated environment—even days after a major outbreak of COVID-19—in light of her compromised immune system was outrageous conduct that caused her severe emotional distress, as was their intention or at the least with a reckless disregard of the near-certainty that such distress would result.

101. The first instance of outrageous conduct was in May 2020 when, days after a major COVID-19 outbreak at the facility, Defendants commanded Plaintiff to return to in-person work.

102. The second instance of outrageous conduct was Vice President McFarland's telephone call in which he threatened Plaintiff with termination if she brought a note from her doctor.

103. The third instance of outrageous conduct was luring Plaintiff back onto the site with promises of a sanitized environment, mask usage and an office that would not be contaminated with other workers when she was absent—all of which were false promises.

104. Each of these would result in severe emotional distress to a near-certainty.

105. Plaintiff is entitled to compensation as a result of this emotional distress.

**Count 5**
**Arizona Earned Paid Sick Time**
**(A.R.S. § 23-364(B).)**

106. Plaintiff incorporates the allegations set forth above as though fully set forth herein.

107. Plaintiff exercised her rights guaranteed under Arizona's Earned Paid Sick Time (AEPST) provisions in taking leave to recover from her surgery through March 2020, as well as attending doctor's visits in April through May.

108. Defendants' commanding Plaintiff to return to in-person work in June 2020, despite the risk to her life and health, was an adverse employment action.

109. This adverse employment action was taken within 90 days of her engaging in activities protected under AEPST provision.

110. Upon information and believe Defendants took such action in retaliation for Plaintiff exercising her right, and will not be able to show by clear and convincing evidence that it was taken for another permissible reason.  A.R.S. § 23-364(B).

111. Plaintiff was also terminated in part for her exercising this right.

112. As a result of Defendants' wrongful conduct, Plaintiff has been damaged.

**Count 6**
**Arizona Employment Protection Act**
**(A.R.S. § 12-1501 et seq.)**

113. Plaintiff incorporates the allegations set forth above as though fully set forth herein.

114. Between May 2020 and August 2020, it was the public policy of the State of Arizona as expressed in several executive orders from the Governor to contain the spread

15

of COVID-19.

115. Plaintiff raised concerns with Defendants about their failure to take reasonable steps to contain the spread of the virus in its facility in general, and specifically in response to the employer's unreasonable and reckless demands that Plaintiff put herself at risk.

116. Plaintiff was terminated in part for her raising these concerns, which was against public policy.

117. As a result of Defendants' wrongful conduct, Plaintiff has been damaged.

WHEREFORE, Plaintiff respectfully requests the following relief:

a) Declaratory judgment finding that Defendants have violated Plaintiff's statutory rights.

b) Actual damages, including lost wages.

c) Compensatory damages resulting from Defendants' discriminatory actions.

d) Compensatory damages resulting from the humiliation, distress, and loss of enjoyment of life that Plaintiff has suffered as a result of Defendants' unlawful and intentional conduct.

e) Punitive damages for the harm Plaintiff has suffered as a result of Defendants' malicious and reckless conduct against Plaintiff.

f) Attorneys' fees and costs under all applicable statutes and law, including, but not limited to, 42 U.S.C. § 1988(b); 42 U.S.C. § 12205; and A.R.S. § 23-364.

g) Any other relief the Court deems just and necessary.

**Jury Trial Requested**

RESPECTFULLY SUBMITTED this 2nd day of August, 2021.

                                          BARTON MENDEZ SOTO PLLC

                                          */s/ James E. Barton II*
                                          James E. Barton II (#023888)
                                          Jacqueline Mendez Soto (#022597)
                                          *Attorneys for Plaintiff*

**Notice of Electronic Filing and Certificate of Service**

I certify that I electronically filed the foregoing with the Clerk of the Court on August 2, 2021, for filing and uploading to the CM/ECF system which will send notification of such filing to all parties of record.

By: /s/ Monse Vejar